IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | |
|---|---|
| DOUGLAS S. HECK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-06078-CV-SJ-REL-SSA |
| ) | |
| CAROLLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred in failing to afford controlling weight to Paul Epp, M.D.'s opinion that Plaintiff had marked limitations in his ability to maintain attention and concentration for extended periods and to work in coordination with or proximity to others without being distracted. I find that the ALJ's opinion is supported by substantial evidence. Plaintiff's motion for summary judgment will, therefore, be denied and the decision of the Commissioner will be affirmed.

### I. BACKGROUND

On February 2, 2012, Plaintiff applied for disability insurance benefits alleging that he had been disabled since January 1, 2011. Plaintiff's application was denied initially. On March 11, 2013, a hearing was held with an ALJ. On March 15, 2013, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On April 16, 2013, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment

2

which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

   Yes = not disabled.
   No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

   No = not disabled.
   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

   Yes = disabled.
   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

   No = not disabled.
   Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

   Yes = disabled.
   No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of Plaintiff, vocational expert Amy Salva, and the documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

**1.     Function Report Adult – Third Party**

On March 2, 2012, Christopher Hopkins completed a function report (Tr. at 169-176). He described himself as business associate and personal life friend (Tr. at 169). Mr. Hopkins noted Plaintiff cared for his children, and the children always appeared happy and content (Tr. at 170). He stated Plaintiff appeared to have lost hope and was in desperation (Tr. at 170). Plaintiff lost his memory and focus, did not get out as often, and had less concentration (Tr. 170-174).

**2.     Function Report Adult – Third Party**

On March 12, 2012, Plaintiff's parents completed a function report (Tr. at 177-184). They noted they lived out of state, but helped with their grandkids at least twice a month; they also did laundry, cleaned and cooked (Tr. at 177, 178). Plaintiff performed normal parental care the best he could (Tr. at 178). When Plaintiff got out of bed, he had trouble focusing on tasks (Tr. at 177). He was able to perform minimal chores on an inconsistent basis (Tr. at 179). Plaintiff's parents provided nearly all financial support such as paying bills and child support (Tr. at 180). They described Plaintiff as having mood swings and being very irritable and argumentative with family (Tr. at 181).

**3.     Function Report**

Plaintiff stated he had his children up to 50% of the time (Tr. at 193). A normal day consisted of waking up between 11 a.m. and 2 p.m. (Tr. at 193). He stayed in bed dozing on and off

4

and sometimes slept into the evening (Tr. at 193). He typically did not get out of bed except to use the bathroom or grab a quick snack before going back to bed (Tr. at 193). He stated he tried his best to care for his children's needs (Tr. at 194). Plaintiff stated depression caused him to sleep and stay in bed for multiple days (Tr. at 194). When manic, he stayed up all night and sometimes multiple nights in a row, then crashed from exhaustion (Tr. at 194). He was able to make his own food, do minimal indoor and outdoor chores and shop (Tr. at 194-196).

### B. SUMMARY OF MEDICAL RECORDS

On July 22, 2011, Plaintiff saw Dr. Epps (Tr. at 333-335). He reported doing much better and responding well to Adderall (Tr. at 333). He was sleeping through the night (Tr. at 333). Energy levels were good, concentration was improved and anxiety levels had not been problematic (Tr. at 333). He spent the weekend doing yard work and playing sports (Tr. at 335). Mental status examination revealed euthymic mood, bright affect, normal rate and volume of speech, and good insight and judgment (Tr. at 334). Assessment included bipolar disorder in remission on medication, ADHD improved with medication (Tr. at 334).

On September 9, 2011, Paul Epp, M.D. saw Plaintiff for mental health treatment (Tr. at 328-329). Plaintiff reported he had spent a lot more time with his kids because his ex-wife was avoiding daycare expense by having him watch them; he had an additional thirty days over the summer (Tr. at 328). Plaintiff had difficulty initiating sleep. Appetite was okay and energy level was good. Anxiety was under control (Tr. at 328). Mental status examination showed euthymic mood, bright affect, pressured speech, some difficulty initiating sleep, good insight and judgment (Tr. at 329).

On October 21, 2011, Dr. Epp indicated Plaintiff's ex-wife had called concerned that Plaintiff was manic. Plaintiff had slept 5 days only sleeping 1-2 hours a night. Energy level was

5

elevated with no change in appetite (Tr. at 321). Dr. Epp noted the Adderall was helpful and had been remarkably good in helping Plaintiff with his attention span (Tr. at 321). Mental status examination showed euthymic mood, appropriate affect, fidgety motor behavior, speech of normal rate and bowling, good insight and judgment. Risperdal was prescribed for sleep and manic symptoms (Tr. at 322).

On December 9, 2011, Plaintiff reported to Dr. Epp that he was struggling financially and mentally. Mood was depressed and anxiety levels were high. His focus was okay with Adderall. Motivation and interest levels were diminished. He was sleeping about eight hours a night. Plaintiff did not report any problems from his medication (Tr. at 317). Mental status examination showed a slightly more depressed mood, appropriate affect, fidgety motor behavior, normal speech, an intact thought process, and good insight and judgment (Tr. at 318). Bipolar disorder, depressed, and ADHD were diagnosed (Tr. at 318).

On January 20, 2012, Plaintiff reported erratic sleep patterns and diminished sleep patterns to Dr. Epp (Tr. at 313). Plaintiff stated he had periods of up to 4 days in duration without sleep and then 4 days in bed. Appetite was poor when he was in bed, but was back to normal (Tr. at 313). Energy and concentration were good. Moods had been liable. Anxiety levels were up at times (Tr. at 313). Mental status examination revealed tense affect, pressured speech, and anxious mood. Plaintiff was started on Depakote (Tr. at 314).

On March 9, 2012, Plaintiff reported he could not take the Depakote because it caused somnolence; he had not been taking any Adderall (Tr. at 308). Sleep phases were erratic and generally moved to the right. Occasionally he missed a night of sleep but he had been getting 7 hours overall (Tr. at 308). Appetite was decent. Energy level was low average. Focus was below average. Moods were up and down. Energy was ranging low average and focus was below

6

average. Plaintiff stated he had not accomplished work since October. Mental status examination revealed affect was appropriate and moods had been somewhat liable (Tr. at 309). Adderall, Ambien, Celexa, Depakote, and Lithium were prescribed (Tr. at 309).

On March 21, 2012, Dr. Epp noted Plaintiff was tolerating Lamictal (Tr. at 304). He appeared much calmer and less jittery but was having trouble initiating sleep. Mood was mid range and appetite was the same; anxiety was reduced (Tr. at 304). It was noted he was having trouble organizing himself for work. Plaintiff's mood was calmer and his affect was more appropriate (Tr. at 305). Assessment included bipolar disorder mixed, and attention and focus problems that seemed to be improved with mediation (Tr. at 305).

Plaintiff also saw Rebecca Robinson, LCSW, on March 21, 2012 (Tr. at 306-307). Plaintiff stated he had experienced mood swings for several years; he was divorced and under a lot of financial pressure (Tr. at 306). Several years ago he lost his mortgage company and had to declare bankruptcy; his wife divorced him and started looking for a wealthy man (Tr. at 306). Mental status examination revealed a neatly groomed individual who was somewhat agitated (Tr. at 306). He had difficulty sitting in his seat. Speech was rapid. Affect was somewhat depressed. Mood was depressed (Tr. at 306). Plaintiff was oriented but somewhat distractible. Insight and judgment were fair (Tr. at 307). Plaintiff's GAF was 55 (Tr. at 307). Diagnoses included bipolar disorder, mixed and attention deficient hyperactivity disorder (Tr. at 307).

On March 26, 2012, Dr. Paul Epp completed a Mental Residual Functional Capacity Assessment (Tr. at 253-255). He indicated Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods and work in coordination with or proximity to others without being distracted by them (Tr. at 253-254). He additionally noted marked restrictions in maintaining concentration, persistence and pace (Tr. at 256). Dr. Epp opined Plaintiff would

have moderate limitations in several areas including his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances; respond to appropriate changes in the work setting; set realistic goals or make plans independently of others; sustain an ordinary routine without special supervision; carry out detailed instructions; and understand and remember detailed instructions (Tr. at 253-254). Plaintiff was slightly limited in the ability to remember locations and work-like procedures; understand and remember short and simple instructions; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors (Tr. at 253-254). He had no limitations with making simple work-related decisions; asking simple questions or requesting assistance; getting along with co-workers or peers; maintaining socially appropriate behavior and adhering to standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; and traveling in unfamiliar places (Tr. at 253-254). Plaintiff's activities of daily living were not limited (Tr. at 256). Dr. Epp noted that Plaintiff had bipolar disorder with ongoing focus problems. He stated Plaintiff had taken Lithium with less than an adequate response and had not done well on other mood stabilizers. Plaintiff was now taking Lamictal and seeing some response (Tr. at 254). Dr. Epp further noted that the presence of sleep disturbance, psychomotor agitation or retardation, difficulty concentrating or thinking, pressure of speech, decreased need for sleep, and easy distractibility were observed (Tr. at 257).

On April 17, 2012, Dr. Epp indicated Plaintiff was doing better on Lamictal (Tr. at 296). He still had erratic sleep behaviors but they were becoming less erratic and he was getting a normal amount of sleep. Energy level was fairly good; his concentration was much better; no racing

8

thoughts (Tr. at 296). There were no problems with his medications (Tr. at 296). Examination revealed Plaintiff's affect was calm; his mood was more even and non-depressed; anxiety levels were under better control (Tr. at 297). Diagnoses included bipolar disorder mixed, improved (Tr. at 297).

On April 17, 2012, Plaintiff presented to Ms. Robinson (Tr. at 302-303). He stated he was meeting with an attorney from child support to discuss his inability to pay and had applied for disability (Tr. at 302). Plaintiff stated he would like to work, but selling insurance was no longer profitable and was highly stressful (Tr. at 302). Mental status examination showed Plaintiff was neatly groomed, somewhat agitated and disorganized. It appeared Plaintiff had difficulty sitting in his seat. Speech was a little fast. Mood was somewhat depressed and affect was within normal limits. Plaintiff was goal-directed but would easily get off topic. Plaintiff was oriented in time, place, and person but he was somewhat distractible. Insight and judgment were fair. Bipolar disorder and attention deficient hyperactivity disorder were diagnosed (GAF 55) (Tr. at 302-303).

On June 1, 2012, Plaintiff saw Dr. Epp (Tr. at 355-356). He reported feeling better and that his moods were more stable (Tr. at 355). Work had been going better and he had been looking at other options, although there was not much else that interested him (Tr. at 355). He felt his medications were working well; concentration was intact; anxiety levels were not problematic (Tr. at 355). Mental status examination revealed a bright affect good mood (Tr. at 356).

On June 11, 2012, Raphael Smith, Psy.D., performed a mental residual functional capacity assessment (Tr. at 57-66). Dr. Smith opined Plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, make simple work-related decisions, get along with coworkers or peers,

9

respond appropriately to changes in the work setting, and set realistic goals and make plans independently of others (Tr. at 63-64).

Plaintiff saw Dr. Epp on July 30, 2012 (Tr. at 349-350). He reported he had taken his kids to Las Vegas (Tr. at 349). He worked about half the month and had his best month since last February (Tr. at 349). Moods were stable; sleep was okay (Tr. at 349). Mental status examination revealed a bright affect and good mood (Tr. at 350).

Plaintiff also saw Ms. Robinson on July 30, 2012 (Tr. at 351-352). He stated he felt depressed last week and did not get much done for two to three days (Tr. at 351). Mental status examination revealed affect and mood were within the normal range; memory and concentration were intact (Tr. at 351). Diagnoses included bipolar disorder and ADHD; moderate psychosocial stressors were noted (Tr. at 351-352). GAF was 60 (Tr. at 352).

On August 31, 2012, Plaintiff told Dr. Epps his sleep patterns remained unstable. They ranged from excessive sleep to no sleep. Energy levels ran high to low. Concentration was difficult at times. It was noted Plaintiff was working between one and four days a week. Dr. Epp discussed increasing Lamictal as well as adding Trazodone. Mental status examination revealed anxious affect and an anxious mood (Tr. at 348).

On September 21, 2012, Dr. Epp indicated Plaintiff found Lamictal to be sedating so he reduced the dosage. Plaintiff reported his mood was a bit depressed and anxiety levels could get high at times (Tr. at 345). Mental status examination showed constricted affect and a depressed mood (Tr. at 346).

On October 12, 2012, Plaintiff had a medication follow-up with Dr. Epp. He reported increased difficulty with depression, sleeping excessively and profoundly low energy; motivation was virtually nonexistent (Tr. at 483). Thoughts were slowed and his head was rather sluggish.

10

Mental status examination revealed appropriate affect and a depressed mood (Tr. at 484). Dr. Epp changed Plaintiff's Lexapro to Effexor (Tr. at 484).

On October 29, 2012, Plaintiff reported he had been sleeping more, his concentration was good, mood had been okay and anxiety levels low (Tr. at 480). Mental status examination revealed a bright affect and good mood (Tr. at 481). Assessment included bipolar disorder in partial remission (Tr. at 481).

Plaintiff saw Dr. Epp for a medication follow-up on December 3, 2012 (Tr. at 477-478). He reported doing better overall (Tr. at 477). Sleep was more consistent, overall mood has been better (Tr. at 477). He reported his concentration was good and that he was not experiencing any problems from medication (Tr. at 477). Mental status examination revealed a bright affect and good mood (Tr. at 478). Assessment included bipolar disorder in partial remission (Tr. at 478).

On February 4, 2013, Plaintiff saw Dr. Epp (Tr. at 474-475). He reported doing about the same (Tr. at 474). Sleep patterns were more regular; his mood had been more stable (Tr. at 474). Mental status examination revealed affect to be brighter and mood was improved (Tr. at 475). Assessment included bipolar disorder in partial remission (Tr. at 475).

### C. SUMMARY OF TESTIMONY

Plaintiff testified during the March 22, 2013, hearing. Vocational expert Amy Salva also testified at the request of the ALJ.

#### 1. Plaintiff's Testimony

Plaintiff testified he was 42 years old and had a Bachelor of Science degree in finance and banking (Tr. at 35, 37). He lived in a house by himself other than when his children resided there thirty-five to forty percent of the time (Tr. at 36). He typically has his children Friday through Sunday, every other week (Tr. at 44-45). Plaintiff's parents come to town every two to four weeks

and helps with the children (Tr. at 47).

Plaintiff left the house four to five times a week to go to the grocery store, post office, appointment or to pick up his kids (Tr. at 37). He participated in his children's school activities sporadically (Tr. at 40).

Plaintiff was in the mortgage business until 2011, making an annual salary ranging from $100,000 to $600,000 (Tr. at 41). He then started selling insurance out of his home (Tr. at 38, 39, 41, 46). He testified he spent eight to twelve hours a week doing so on average (Tr. at 40). It was a challenge for Plaintiff to work consistently with his symptoms (Tr. at 39). Plaintiff had depression where he was up and down, either sleeping for multiple days and then suffering with insomnia for days (Tr. at 42). He also had fatigue and anxiety (Tr. at 42). At times he experienced headaches and dizziness (Tr. at 48). During depressive episodes Plaintiff found it hard to get out of bed and barely ate (Tr. at 43). This lasted multiple days (Tr. at 43). He had drastic mood swings (Tr. at 43). He might feel invincible one moment and twelve hours later would have another depressed episode (Tr. at 43). Plaintiff took medications but his doctors often rotated them and he had side-effects (Tr. at 44). He sometimes felt groggy from the medications (Tr. at 44). Other times he forgot to take his medications (Tr. at 44).

Plaintiff often missed appointments due to fatigue and symptoms of depression (Tr. at 46). Out of a 30 day period, he struggled between 10 to 12 days with symptoms of depression (Tr. at 46). He did not think that an employer would keep him due to attendance issues (Tr. at 47).

## 2.     Testimony of Vocational Expert

The ALJ first asked the vocational expert to assume an individual of Plaintiff's age, education, past work and experience who was limited to unskilled work with only occasional and non-intensive action with the public, and only occasional interaction with coworkers and

supervisors (Tr. at 53). The vocational expert stated that such an individual could not perform any of Plaintiff's past work, but could work as an order filler, laundry worker or retail marker (Tr. at 53-54).

The ALJ next asked the vocational expert to assume such an individual had difficulty with consistency, having up to ten unexcused absences a month (Tr. at 54-55). The vocational expert opined this would preclude all competitive work.

### D. FINDINGS OF THE ALJ

On March 15, 2013, the ALJ issued an opinion finding that Plaintiff was not disabled at step five of the sequential analysis. The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since his alleged onset date (Tr. at 15). At step two, the ALJ found Plaintiff had the following "severe" impairments: bipolar disorder; anxiety and ADHD (Tr. at 15-17). At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing (Tr. at 17-19). At step four, the ALJ found Plaintiff was unable to perform past relevant work (Tr. at 23-24). Finally, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform (Tr. at 24-25).

### V. *WEIGHT TO DR. EPP'S OPINIONS*

Plaintiff maintains the ALJ erred in failing to afford his treating psychiatrist's opinions controlling weight. Specifically, Plaintiff argues that the ALJ should gave given more weight to Dr. Epp's opinions that he had marked limitations in (1) maintaining attention and concentration and (2) the ability to work in coordination with or proximity to others without being distracted by them.

The ALJ found Plaintiff retained the residual functional capacity "to perform a full range

13

or work at all exertional levels with the following nonexertional limitations: He is limited to unskilled work with only occasional interaction with coworkers and supervisors and only occasional and non-intense interaction with the public." (Tr. at 19). The ALJ analyzed Dr. Epp's opinions as follows:

> Dr. Epp, the claimant's treating psychiatrist, completed [a] mental source statement indicating the claimant has "marked" limitations in the ability to maintain attention and concentration for extended periods and the ability to work in coordination with or proximity to others without being distracting to them. In assessing the "paragraph B" criteria of listings 12.04 and 12.06, Dr. Epp opined claimant had "marked" limitations in maintaining concentration, persistence and pace, but no restrictions in activities of daily or social functioning. The opinion provided by the claimant's treating psychiatrist, Dr. Epp, appears overstated in light of the GAF scores of record, the claimant's work activity after the alleged onset date, his trips to Las Vegas and the fact that he cares for his children up to 50% of the year with little assistance. Dr. Epp's assessment has been granted partial weight because, with the exception of his opinion of marked limitations in maintaining attention and concentration and ability to work in coordination with or proximity to others without being distracted by them, the doctor's opinion is generally consistent with the residual functional capacity. I have afforded his opinion weight insofar as it is consistent with the claimant's residual functional capacity . . . .

(Tr. at 22).

"A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with the other substantial evidence." Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2001)(quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Id. (quoting Medhaug, 578 F.3d at 815). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. (quoting Medhaug, 578 F.3d at 815). Additionally, a treating physician's opinions

14

can be discounted when inconsistent with the claimant's self-reported abilities. Toland v. Colvin, 761 F.3d 931, 936 (8th Cir. 2014).

In this case, review of the record reveals Plaintiff's self-reported abilities are inconsistent with marked limitations. Plaintiff cared for his children up to 50% of the time, even spending thirty more days with them during the summer of 2011 (Tr. at 193, 328). He consistently reported to Dr. Epp that his energy and concentration levels were good, and that anxiety levels were not problematic (Tr. at 296, 313, 328, 333, 351, 355, 477, 480). The record also reflects that Plaintiff continued to work after his alleged onset date (Tr. at 305, 309, 348, 349, 355) and suggests that the fact he was not working was not due to an inability to do so, but rather because he could not find something that paid as well that he found interesting. Specifically, Plaintiff told Ms. Robinson that he would like to work but selling insurance was no longer profitable and highly stressful (Tr. at 302). Plaintiff told Dr. Epp that he had been looking at other work options, but there was not much else that interested him (Tr. at 355).

Dr. Epp's opinions regarding marked limitations are also inconsistent with his own treatment notes as well as with other medical records of evidence. Mental status exams revealed good moods, bright affect and good insight and judgment (Tr. at 297, 322, 328, 334, 350, 356, 475). Dr. Epp's assessments on July 22, 2011, October 29, 2012, December 3, 2012 and February 4, 2013, stated Plaintiff's bipolar disorder was in partial remission (Tr. at 334, 475, 478). Plaintiff responded well to his Adderall for issues with concentration and focus (Tr. at 305, 317, 321, 334). See Ponder v. Colvin, 770 F.3d 1190, 1194 (8th Cir. 2014); Perkins, 648 F.3d at 898-99. His GAF scores always indicated symptoms in the moderate range (Tr. at 303, 307, 352). Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013). Dr. Smith opined plaintiff only had moderate limitations in these areas (Tr. at 63-34). Substantial evidence thus supports the ALJ's

15

decision not to give Dr. Epp's opinions regarding attention/concentration and the ability to work with others controlling weight.

## VI. CONCLUSION

As a result, it is

ORDERED that Plaintiff's motion for summary judgment is denied.   It is further

ORDERED that the decision of the Commissioner is affirmed.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 23, 2015

16

Case 5:13-cv-06078-REL   Document 31   Filed 03/24/15   Page 16 of 16